



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed September 30, 2020**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Silver State Holdings, Assignee—7901 | § | Case No. 19-41579-mxm |
| Boulevard 26 LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |

---

| | | |
|---|---|---|
| | § | |
| Valley Ridge Roofing and Construction, | § | |
| LLC, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 19-4043-mxm |
| | § | |
| Silver State Holdings, Assignee—7901 | § | |
| Boulevard 26 LLC, 7901 BLVD 26, LLC, | § | |
| and Richard N. Morash, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
*[Relates to Adv. ECF Nos. 1-6 and 47]*

The Court held a two-day trial to liquidate all claims asserted by Plaintiff Valley Ridge Roofing and

Construction, LLC ("***Valley Ridge***") against Defendants Silver State Holdings, Assignee—7901 Boulevard 26

LLC ("***Silver State***") and Richard N. Morash ("***Morash***") (together, the "***Defendants***").

# I.   SUMMARY OF THE DISPUTE

Morash was the sole member, manager, and director of 7901 BLVD 26, LLC ("*7901*").  In 2015, 7901 purchased the real property and improvements located at 7901 Boulevard 26, North Richland Hills, Texas (the "*Property*") and leased the Property to a third-party tenant.  The tenant converted the Property, formerly a Home Depot, into a high-end indoor shooting range.  By early 2018, however, the tenant had defaulted on the lease, closed the shooting range, and abandoned the Property.  In the meantime, the Property had suffered roof damage caused by a storm, so 7901 contracted with Valley Ridge to repair the roof.  After a dispute arose over the roof-repair contract balance, the parties went to arbitration, which concluded with a judgment and a judgment lien in favor of Valley Ridge against 7901 and the Property.  The Valley Ridge judgment lien on the Property was subordinate to ad valorem tax liens of Tarrant County of nearly $100,000, a $3.4 million lien held by Frost Bank, and a $180,000 third-priority lien held by the City of North Richland Hills.

In late November and early December 2018, when Valley Ridge was attempting to collect on its judgment, Morash formed Silver State and caused Silver State to acquire the city's claim and lien against the Property.  As the new holder of the city's third-priority lien on the Property, Silver State posted the Property for foreclosure and acquired the Property at a January 2, 2019 foreclosure sale, wiping out Valley Ridge's junior lien and leaving the Property subject only to the Tarrant County tax lien and the Frost Bank lien.  Valley Ridge discovered what happened and filed an involuntary bankruptcy petition against 7901.  Silver State then filed its own bankruptcy case and sold the Property to a third party under § 363 of the Bankruptcy Code.  The net sale proceeds of roughly $577,000, after payment of the Frost Bank lien and other claims and closing costs, are currently being held in the Court's registry.

Through the Complaint,[1] Valley Ridge seeks a judgment against Silver State and Morash through various legal claims under the Bankruptcy Code and Texas law, including preferential transfer, actual and constructive fraudulent transfer, wrongful foreclosure, breach of fiduciary duty, conspiracy, aiding and abetting, and concert of action.  In addition, Valley Ridge seeks recovery and turnover of the funds held in the Court's registry.

The Court has considered the pleadings and other papers filed in this adversary proceeding and in the bankruptcy cases of 7901 and Silver State, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel.  The following constitutes the Court's findings of fact and conclusions of law[2] in support of this ruling as required by Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

As set forth below, the Court finds and concludes that the transfer of the Property through the foreclosure was a preferential transfer and an actual fraudulent transfer, and that Silver State has no defenses to avoidance of the transfer under Bankruptcy Code §§ 547, 548 or to Valley Ridge's recovery of the funds held in the Court's registry under § 550.  The Court denies all other relief requested by the parties, unless specifically reserved for post-trial determination.

---

[1] *Plaintiff's Second Amended Complaint*, Adv. ECF No. 47 (the "***Complaint***") filed by Areya Aurzada, the Chapter 7 trustee (the "***7901 Chapter 7 Trustee***") for the bankruptcy estate of 7901.  Valley Ridge is the successor-in-interest to the claims originally held by the 7901 Chapter 7 Trustee.  As detailed in the Procedural History section of this opinion, prior to 7901's bankruptcy case, Valley Ridge filed suit against 7901 in the State Court Proceeding seeking to foreclose its lien on the Property.  Valley Ridge amended its lawsuit in the State Court Proceeding to add Silver State as a defendant and to assert a fraudulent-transfer claim under Chapter 24 of the Texas Business and Commerce Code.  The fraudulent-transfer claim is also asserted in the Complaint.

[2] Any findings of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district.  This adversary proceeding is a core proceeding over which the Court has both statutory and constitutional authority to enter a final judgment.  To the extent this proceeding is a non-core proceeding, the parties have consented to this Court's entry of a final judgment.[3]

Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## III.    PROCEDURAL HISTORY[4]

On October 29, 2018, Valley Ridge initiated Case Number 048-303979-18 (the "*State Court Proceeding*") by filing an original petition (the "*Valley Ridge Original Petition*")[5] against 7901 in the 48th Judicial District Court for Tarrant County, Texas (the "*State Court*"), seeking to foreclose on its previously obtained mechanic's lien and judicial lien against the Property.

On December 21, 2018, 7901 filed a general denial answer in the State Court Proceeding.[6]

On February 26, 2019, Valley Ridge filed an amended petition (the "*Valley Ridge Amended Petition*")[7] in the State Court Proceeding, adding Silver State as a defendant and asserting claims for (a) judicial foreclosure of its mechanics' lien and judicial lien, and (b) fraudulent transfer under Chapter 24 of the Texas Business and

---

[3] *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948–49 (2015).

[4] Some of the information in this section is repeated below under the Findings of Fact, but a brief history of the two pending bankruptcies (one by 7901 and one by Silver State) and the litigation between the parties will help the reader understand why—despite the caption of this Memorandum Opinion—7901 is the relevant "debtor" for purposes of the preference and fraudulent-transfer counts and why Valley Ridge is the party pursuing those claims.

[5] Pl.'s Ex. 14.

[6] Adv. No. 19-4043, ECF No. 1-4.

[7] Adv. No. 19-4043, ECF No. 1-6.

Commerce Code based on a January 2, 2019 state law foreclosure on the Property by Silver State.

On April 8, 2019, Silver State filed a general denial answer in the State Court Proceeding.[8]

On March 6, 2019, Valley Ridge filed an involuntary petition against 7901 pursuant to 11 U.S.C. § 303, initiating Bankruptcy Case No. 19-40989.[9] The Court later entered an order for relief against 7901 after a contested trial.[10]

On April 18, 2019, Silver State filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, initiating Bankruptcy Case No. 19-41579.[11]

On April 22, 2019, Silver State removed the State Court Proceeding to this Court pursuant to Federal Rule of Bankruptcy Procedure 9027(a) and 28 U.S.C. § 1452, initiating this Adversary Proceeding No. 19-4043.[12] Silver State later filed an amended answer and counterclaim (the "***Amended Answer and Counterclaims Against Valley Ridge***"), asserting affirmative defenses and seeking (a) declaratory relief that Valley Ridge has no claim, lien, or right against Silver State or against the Property or its proceeds; (b) quiet title to the Property; and (c) attorney's fees and costs.[13]

On May 22, 2019, the Court entered an order (the "***Sale Order***")[14] in the Silver State bankruptcy case (a) permitting Silver State to sell the Property to a third-party purchaser, with all disputed liens, claims, interests, and

---

[8] Adv. No. 19-4043, ECF No. 1-10.

[9] Case No. 19-40989, ECF No. 1.

[10] Case No. 19-40989, ECF No. 41.

[11] Case No. 19-41579, ECF No. 1.

[12] Adv. No. 19-4043, ECF No. 1.

[13] *Defendant's Amended Answer to Plaintiff's Complaint and First Counterclaim*, Adv. No. 19-4043, ECF No. 13.

[14] *Order (I) Granting Debtor's Motion to Sell Real Property Free and Clear of all Liens, Claims, Interests, and Encumbrances; and (II) Providing for Certain Payments at Closing*, Case No. 19-41579, ECF No. 35.

encumbrances against the Property attaching to the sale proceeds; (b) ordering the net sale proceeds (the "***Registry Funds***") to be placed into the registry of the Court; and (c) providing that nothing in the Sale Order prejudices Valley Ridge's claims against Silver State and 7901 in this Adversary Proceeding. After the closing of the sale, Registry Funds of $627,050.37 were deposited into the Court's registry.[15]

On October 28, 2019, pursuant to an agreed order in this Adversary Proceeding,[16] the 7901 Chapter 7 Trustee was substituted for Valley Ridge with respect to Valley Ridge's fraudulent-transfer claim.

On October 31, 2019, the 7901 Chapter 7 Trustee filed her *Plaintiff's Second Amended Complaint*,[17] adding Morash as a defendant and asserting claims against Silver State and Morash for (a) fraudulent transfer under Chapter 24 of the Texas Business and Commerce Code and § 544 of the Bankruptcy Code; (b) actual and constructive fraudulent transfer under § 548 of the Bankruptcy Code; (c) preferential transfer under § 547 of the Bankruptcy Code; (d) wrongful foreclosure; (e) breach of fiduciary duty; (f) conspiracy, aiding and abetting, and concert of action; and (g) turnover of property of the estate under § 542 of the Bankruptcy Code. The 7901 Chapter 7 Trustee also sought recovery of the Property or its value pursuant to § 550 of the Bankruptcy Code, as well as interest, attorney's fees, and costs.

The Defendants answered the Second Amended Complaint,[18] with Silver State also asserting counterclaims for (a) disallowance of the claims asserted by the 7901 Chapter 7 Trustee in a proof of claim filed

---

[15] *Ex Parte Order Authorizing and Requiring Deposit of Net Sale Proceeds into the Registry of the Court*, Case No. 19-41579, ECF No. 40.

[16] Adv. No. 19-4043, ECF No. 46, *Scheduling Order and Order Substituting Plaintiff in Part*.

[17] Adv. No. 19-4043, ECF No. 47.

[18] Adv. No. 19-4043, ECF Nos. 58 (Silver State), 61 (Morash).

in the Silver State bankruptcy case (the "***7901 Chapter 7 Trustee Proof of Claim***")[19]; (b) a surcharge against the proceeds from the sale of the Property under § 506(c) of the Bankruptcy Code; and (c) attorney's fees, interest, and expenses (the "***Answer and Counterclaims against 7901 Chapter 7 Trustee***").

On January 8, 2020, the Court entered an order (the "***Settlement Order***")[20] pursuant to which the 7901 Chapter 7 Trustee, Silver State, and Valley Ridge agreed that, among other things, (a) $50,000 of the Registry Funds would be transferred to the 7901 Chapter 7 Trustee for the benefit of 7901's bankruptcy estate, to the exclusion of Silver State and Valley Ridge; (b) all claims and causes of action asserted by the 7901 Chapter 7 Trustee in the Second Amended Complaint against Silver State and Morash (as well as the related claims asserted by the 7901 Chapter 7 Trustee in the 7901 Chapter 7 Trustee Proof of Claim) were assigned to Valley Ridge (the "***Assigned Claims***") to prosecute for its sole benefit; (c) Valley Ridge was substituted into this Adversary Proceeding for the 7901 Chapter 7 Trustee, and the 7901 Chapter 7 Trustee was removed as a party to this Adversary Proceeding; and (d) Valley Ridge preserved its right to seek recovery on the Assigned Claims and the Registry Funds, but (with an exception not relevant here) waived any entitlement to any distribution from the 7901 bankruptcy estate.

On January 17, 2020, the Court denied Silver State's motion for partial summary judgment on Counts 1, 2, 3, 4, 6, and 7 of the Plaintiff's Second Amended Complaint.[21]

---

[19] Case No. 19-41579, Claim 4-1.

[20] *Agreed Order Approving Inter-Estate Compromise and Settlement*, Case No. 19-40989, ECF No. 74; Case No. 19-41579, ECF No. 133.

[21] Adv. No. 19-4043, ECF No. 63.

After the entry of the Settlement Order, $577,050.37 of Registry Funds remain. Silver State and Valley Ridge are the only parties remaining with claims to these funds. For purposes of this lawsuit, even though this Adversary Proceeding is in the Silver State bankruptcy case, Silver State is not the relevant "debtor" for purposes of Valley Ridge's fraudulent-transfer and preference claims; instead, 7901 is the relevant debtor, and Silver State is the transferee of the Property.

## IV. FINDINGS OF FACT[22]

### A. 7901 AND BODYGUARD

1. 7901 is a Texas limited liability company.

2. Morash has been a manager and an insider of, and controlled, 7901 at all relevant times.

3. In 2015, 7901 purchased the Property.

4. 7901 financed its purchase of the Property with a loan from Frost Bank, a Texas State Bank ("*Frost*"), in the original principal amount of $3.4 Million (the "*Frost Loan*").

5. Frost perfected a lien against the Property securing the Frost Loan, by recording a deed of trust against the Property (the "*Frost Lien*"), which deed of trust was junior in priority only to the ad valorem liens of Tarrant County assessed against the Property.

6. Morash personally guaranteed all obligations of 7901 under the Frost Loan.

7. The Property had previously been used as a Home Depo Expo. Silver State purchased the Property in order to lease it out to a third-party tenant.

---

[22] The headings and numbered paragraphs in this section are taken from the STATEMENT OF STIPULATED FACTS section in the *Joint Pretrial Order*, Adv. ECF No. 83. With a few nonmaterial, stylistic changes, the Court has adopted the parties' stipulated facts. The lettered subparagraphs in this section are the Court's independent findings.

8.      Pursuant to that plan, 7901, as lessor, entered into a long-term commercial real estate lease (the "*Lease*") with Bodyguard Sports I, LP ("*Bodyguard*").

9.      On October 16, 2015, Bodyguard executed a note in the principal amount of $180,000.00 (the "*October 2015 Note*") in favor of the City of North Richland Hills, Texas (the "*City*") for a loan (the "*City Loan*") obtained from the City.

10.     On October 16, 2015, 7901 executed a Second Lien Deed of Trust in favor of the City granting a second lien against the Property to secure the October 2015 Note ("*City Lien*").  The parties disagree regarding what exactly the City Lien secured, including whether it was limited solely to the October 2015 Note.

11.     On April 26, 2017, Bodyguard executed a Note in the principal amount of $180,000.00 in favor of the City ("*April 2017 Note*").  The parties otherwise disagree as to whether the City Lien remained valid as of the time of the Foreclosure (defined below) due to an alleged amendment, or restatement, or termination of one or more notes evidencing the City Loan; the parties agree only that, at the time of the October 2015 Note, the City recorded the City Lien and held the foregoing lien.

12.     No new deed of trust was executed when the April 2017 Note was executed.  The parties otherwise disagree as to whether the City Lien remained valid as of the time of the Foreclosure (defined below) due to an alleged amendment, or restatement, or termination of one or more notes evidencing the City Loan; they agree only that, at the time of the origination of the October 2015 Note, the City recorded the City Lien and held the foregoing lien.

13.     On October 22, 2015, The First National Bank of Tom Bean ("*Tom Bean Bank*") recorded against the Property that certain UCC fixture filing (the "*Tom Bean Fixture Filing*").

9

## B.  VALLEY RIDGE AND VALLEY RIDGE LIEN

14.     Valley Ridge is a Texas limited liability company specializing in repairing and replacing roofs, including on commercial buildings.

15.     In 2016, a storm damaged the roof on the Property.  7901 had insurance in place to repair or replace the roof.

16.     7901 contracted with Valley Ridge to replace the roof, pursuant to a Commercial/Specialty Roofing Agreement executed by the parties on September 9, 2016.

17.     Ultimately, Valley Ridge replaced the roof, at a cost to 7901 of almost $2 million.  7901, using insurance proceeds, paid Valley Ridge more than $1.6 million of this price.  However, a dispute arose between the parties regarding whether 7901 owed Valley Ridge approximately $300,000 more in insurance proceeds 7901 had received than it had paid for the replacement of the roof.

18.     On June 27, 2017, Valley Ridge recorded that certain Affidavit for Mechanic's and Materialman's Lien against the Property, assigned Tarrant County Clerk's file number D217145587 claiming that 7901 owed $863,293.79 to Valley Ridge for labor and materials.

19.     Thereafter, Valley Ridge initiated an arbitration proceeding against 7901, at which Valley Ridge prevailed, and the arbitrator awarded Valley Ridge $508,633.49 against 7901.  Thereafter, Valley Ridge obtained a judicial confirmation of that award, in the nature of a final judgment (the "***Judgment***") entered on May 16, 2018 by the 298th Judicial District Court of Dallas County, Texas.

20.     After the arbitration was instituted, and before the award and the Judgment, 7901 paid $521,570.15 to Valley Ridge.

10

21.     The Judgment awarded Valley Ridge $508,633.49 against 7901, together with post-judgment interest at the rate of 8% per annum from the date of the Judgment until paid in full.

22.     On September 27, 2018, Valley Ridge recorded a judgment lien against the Property, by a valid Abstract of Judgment recorded against the Property, thereby obtaining a judicial lien against the Property to secure the Judgment (the "***Judgment Lien***").

23.     The Judgment and the Judgment Lien remain wholly unsatisfied.

24.     On or about March 21, 2018, 7901 and 356 Development LLC entered into a Commercial Contract of Sale ("***March 2018 Contract***") for the sale of the Property for a purchase price of $5,375,000.00.

25.     The March 2018 Contract was scheduled to close on May 17, 2018.

26.     The March 2018 Contract did not close on May 17, 2018 because the potential purchaser was fishing for an investment property, which would require an income-producing tenant, and the potential purchaser's tenant fell through.

27.     7901 expected that the proceeds from the March 2018 Contract would be sufficient to pay all liens against the Property and planned on paying Valley Ridge the full amount due on the Judgment out of the proceeds from the closing of the March 2018 Contract.

## C.  7901, SILVER STATE, AND THE FORECLOSURE

28.     By October 18, 2017, Bodyguard defaulted on the Lease, and 7901 subsequently terminated the Lease on May 2, 2018. By that time, Bodyguard abandoned the Lease and all personalty and fixtures on the Property.  From that time through the Sale (defined below), the Property remained vacant and 7901 derived no revenue or income from the Property or any other source.

29.     On October 29, 2018, Valley Ridge filed the State Court Proceeding for the purpose of foreclosing on its liens against the Property.

30.     In September 2018, 7901 ran out of cash.

31.     Before September 2018, in order to pay its creditors, 7901 had to rely on infusions of cash from other entities owned or controlled directly or indirectly by Morash, including D. F. Land Co., L.C. ("***D.F. Land***") and Morash Family Limited Partnership.

32.     On January 2, 2019, the sum of 7901's debts was greater than all of 7901's assets at a fair valuation, but excluding the value of the Property.

33.     On January 2, 2019, 7901 had $823.42 in its Frost Bank account with little or no other assets other than the Property (prior to the Foreclosure).

34.     7901 lost its only asset of any real value as a result of the Foreclosure.

35.     On or about December 6, 2018, at the direction of Morash, a certificate of formation forming Silver State was filed with the Texas Secretary of State.

36.     Silver State was wholly owned by D. F. Land at all relevant times.

37.     Morash was the owner and manager and in control of D.F. Land at all relevant times.  Morash was therefore an insider of and in control of Silver State at all relevant times.

38.     Morash formed Silver State to acquire the City Lien and foreclose on the Property.  The Parties dispute the validity of the City Lien.

39.     In December 2018, at the direction of Morash, Silver State purchased the City Lien from the City, which on December 11, 2018 executed an assignment of the City Lien to Silver State.  The Parties dispute the

validity of the City Lien.

40.     Silver State paid the City $180,000.00 for the assignment of the City Lien.  The Parties dispute the validity of the City Lien.

41.     On December 11, 2018, Silver State appointed David Garvin as the substitute deed of trust trustee under the City Lien.  Garvin then provided the necessary required notice as specified by Texas law, providing the necessary 21-day period prior to foreclosure, and he filed the necessary notices and posted them appropriately with Tarrant County, all as specified by Texas law.  By agreeing to these facts, Valley Ridge does not admit that the City Lien was valid and enforceable at that time or that Garvin was authorized to issue, file, and post the notice of foreclosure.  Valley Ridge further does not admit that Garvin and/or Silver State provided notice to 7901 of Bodyguard's default and of an intention to foreclose.

42.     Garvin convened the foreclosure sale on January 2, 2019, the date specified for such under Texas law and at the appropriate time and location as specified under Texas law and as noticed in his notice of foreclosure sale.  By agreeing to these facts, Valley Ridge does not admit that the City Lien was valid and enforceable at that time or that Garvin was authorized to conduct the Foreclosure.

43.     Neither Garvin nor anyone else provided notice to Valley Ridge of the noticed Foreclosure.  By agreeing to this fact, Silver State does not admit that Valley Ridge lacked notice of the Foreclosure by virtue of "notice to the world" under Texas law.

44.     Valley Ridge did not know of the noticed Foreclosure.  By agreeing to this fact, Silver State does not admit that Valley Ridge lacked notice of the Foreclosure under Texas law.

13

45.     Silver State submitted a credit bid at the Foreclosure sale in the amount of $200,000.00, which credit bid Garvin accepted, thereby selling, on January 2, 2019, the Property to Silver State pursuant to his power of sale under the City Lien and applicable Texas foreclosure laws (the "***Foreclosure***").  By agreeing to these facts, Valley Ridge does not admit that the City Lien was valid and enforceable at that time, that Garvin was authorized to conduct the Foreclosure, or that Silver State was authorized to submit a credit bid.

46.     On January 4, 2019, Garvin executed a Substitute Trustee's Deed Conveying title to the Property to Silver State, which was filed in the deed records of Tarrant County, Texas on January 7, 2019.

   a)     The Court's following independent findings duplicate in some respects the stipulated facts above regarding the Foreclosure, but they highlight the troubling timing of some of the events.

   b)     An attorney who testified at trial ("***Attorney***") was counsel for 7901, Morash, and later, Silver State.[23]  At trial, Attorney was evasive and defensive in his testimony concerning his communications with Bruce Bagelman, counsel for Valley Ridge, regarding the potential sale of the Property and potential payoff of the Valley Ridge Judgment.   Attorney was also evasive and defensive in his testimony regarding his communications and Morash's communications with the City regarding acquisition of the City Loan and City Lien.

   c)     In a series of email exchanges on May 10, 2018, Attorney and Bagelman discussed the anticipated closing of the March 2018 Contract and the payoff of Valley Ridge's Judgment Lien.[24]  At 4:53 p.m. on May 10, 2018, Attorney notified Bagelman that "the purchaser terminated today so it will not be closing on

---

[23] *E.g.*, 7/20/20 hrg. at 10:59 a.m., 11:16 a.m.–11:18 a.m.

[24] Pl.'s Ex. 8.

14

the 17th.  We anticipate that there will be a new buyer soon and will keep you posted."[25]  In response to further inquiries from Bagelman regarding the potential new buyer, Attorney noted on May 17, 2018 that 7901's broker would be meeting with the potential new buyer's broker and that "I will update you as I get more information."[26] In May, June, and July 2018, Bagelman continued to ask for updates on the sale process, and Attorney continued to provide updates[27] while thanking Bagelman for his patience.[28]  In one email exchange, Bagelman told Attorney that he was asking for updates because "I am just trying to keep my client complacent through this process."[29]

> d)      During these email exchanges, Attorney asked for and received an extension to respond to Valley Ridge's post-judgment discovery in aid of collecting on the Valley Ridge Judgment.[30]  And again, Attorney promised, "I will keep you posted re the expected offer."[31]

> e)      On July 16, 2018, in response to Valley Ridge's post-judgment discovery, Attorney signed and served objections and responses to interrogatories, one of which (No. 12) asked 7901 to identify all loans or mortgages taken out by 7901 that are secured by the Property, including the name of the institution holding the loan or mortgage.[32]  The response to interrogatory No. 12 identified (among others) the City Mortgage securing the City Loan held by "CITY OF NORTH RICHLAND HILLS."[33]  7901 and Attorney never supplemented the

---

[25] *Id.*

[26] *Id.*

[27] Pl.'s Exs. 9–12.

[28] Pl.'s Exs. 10 (June 6, 2018 email); 11 (July 11, 2018 email).

[29] Pl.'s Ex. 10 (June 25, 2018 email).

[30] Pl.'s Ex. 11 (July 11, 2018 email).

[31] *Id.*

[32] Pl.'s Ex. 48.

[33] *Id.*

interrogatory responses to identify the new holder of the loan and mortgage once Silver State acquired the City Loan and City Lien.[34]

f)    On July 30, 2018, Bagelman again asked for an update, noting, "My client is getting anxious to do something. Thanks."[35]  Attorney responded the next day, giving an update on a potential purchaser and noting, in response to Valley Ridge's discovery interrogatory about funding and draws: "Mr. Morash put in approximately $1 million to improve the property and has not taken any draws from the property.  What little was collected in rent (there has only been one tenant) went to mortgage payments, taxes, and insurance.  I will keep you posted, and thanks in the meantime for your and Valley Ridge's patience."[36]

g)    On November 5, 2018, Morash sent an email to Maleshia McGinnis and Craig Hulse of the City stating:

---

[34] At trial, Attorney testified that 7901 had no duty to supplement. The relevant Texas rule does not support Attorney.  Rule 193.5 of the Texas Rules of Civil Procedure provides in relevant part:

    (a) **Duty to amend or supplement.**  If a party learns that the party's response to written discovery was incomplete or incorrect when made, *or, although complete and correct when made, is no longer complete and correct,* the party must amend or supplement the response:

    . . . .

    (2) to the extent that the written discovery sought other information, unless the additional or corrective information has been made known to the other parties in writing, on the record at a deposition, or through other discovery responses.

TEX. R. CIV. P. 193.5(a)(2).  The Court concludes that 7901 and Attorney had a duty to supplement the interrogatory responses to identify the new holder of the loan and mortgage once Silver State acquired the City Loan and City Lien.  Even if they did not have a duty to supplement under Rule 193.5, the Court would still find, based on all of the other evidence, that 7901, Morash, and Attorney (as explained below) intended to mislead Valley Ridge and Bagelman and to hinder, delay, or defraud Valley Ridge.

[35] Pl.'s Ex. 12 (July 30, 2018 email).

[36] Pl.'s Ex. 12 (July 31, 2018 email).

> The City of North Richland Hills has a *second* lien on [7901].  Unless [7901] is able to clear title of certain historical liens impacting marketability, it will not be able to service the first lien and will not be able to sell the property. Obviously, the property, the community, and the city will benefit from a new owner that has the time and resources to keep the property leased and maintained.  Accordingly, [7901] is asking the city to assign its lien, in exchange for which [7901] will agree to pay the assigned lien in full (including interest) upon a subsequent sale by [7901] out of REO ***after foreclosure of the assigned lien***.  Please note that if the City does not assign its second lien as requested there will likely be foreclosure of the first lien, which will wipe out the City's second lien position altogether without compensation.  We strongly believe, therefore, that this proposal is beneficial to the City[37]

At trial, Attorney testified that Morash sent this email on Morash's own behalf and in Morash's individual capacity.[38]  Morash, on the other hand, testified that he sent the email on 7901's behalf.[39]  Since Silver State was not formed until December 6, 2018, it is clear the email was not sent on Silver State's behalf.

       h)      On November 14, 2018, a broker for Camping World Property, Inc. sent a nonbinding letter of intent ("***LOI***") to Derek Schuster and David Zoller of the Weitzman Group, 7901's broker.  The LOI, which contemplated a sale of the Property for $4.6 million, was subject to various contingencies and was not signed by Camping World.[40]  One of the LOI's contingencies was that the Property would be rezoned to allow Camping World to use the Property as a recreational vehicle sales and service dealership.[41]

---

[37] Pl.'s Ex. 15 (emphasis added).

[38] 7/20/20 hrg. at 11:11 a.m.–11:13 a.m.

[39] 7/20/20 hrg. at 1:27 p.m.

[40] Pl.'s Ex. 16.

[41] *Id.*

i)      On November 21, 2018, Attorney sent to Maleshia McGinnis and Craig Hulse of the City draft assignment documents for the acquisition of the City Lien.[42]

j)      On November 27, 2018, Craig Hulse of the City asked Attorney and Morash for a copy of the LOI.[43]  Morash responded the same day, stating that since Morash had signed the LOI the prior week, there had been minor discussion about price; "However I believe the buyer and seller are now in accord on all terms. Hopefully that will turn into an LOI signed by both parties tomorrow but maybe it will take all week."[44]

k)      On December 3, 2018, Maleshia McGinnis of the City sent to Attorney draft changes to the assignment agreement for the City Lien and noted that the City still needed a copy of the LOI.[45]  And again, on December 4, 2018, McGinnis told Attorney and Morash that the City still needed the LOI.[46]

l)      On December 5, 2018, Morash sent to Craig Hulse of the City an email attaching the "LOI signed by me containing all terms agreed to by Camping World."[47]  Hulse responded the same day, acknowledging receipt but requesting, "In the event you receive the fully executed version [*i.e.*, signed by Camping World], please forward."[48]

m)      Morash formed Silver State the next day, December 6, 2018.[49]

---

[42] Pl.'s Ex. 17 (Nov. 21, 2018 email).

[43] *Id.* (Nov. 27, 2018 email chain).

[44] *Id.*

[45] Pl.'s Ex. 18.

[46] Pl.'s Ex. 19.

[47] Pl.'s Ex. 20.

[48] *Id.*

[49] Pl.'s Ex. 21.

18

n)      On December 7, 2018, Attorney sent to the City (among other documents) the corporate formation documents for Silver State, the proposed assignee under the draft assignment agreement for the City Lien.[50]  Later that same day, Attorney wrote the City:  "Maleshia, the back up contract went hard and Dick [Morash] wants to pay cash rather than payment at closing provided we can get the lien assigned by Tuesday afternoon [December 11, 2018].  Please call me when you can to discuss details."[51]  At trial, however, Attorney was not able to identify the "back up contract" referenced in his December 7, 2018 email to the City.[52]

o)      Schuster, the broker for both 7901 and Silver State, testified at trial that Camping World never signed an agreement with 7901 or obtained the zoning change it wanted as a condition to purchasing the Property.[53]  Schuster also testified that from December 2018 through January 2, 2019 (the date of the Foreclosure), there was no pending offer for the Property from any third party.[54]

p)      After considering the testimony of the witnesses and the documentary evidence, the Court finds and concludes that Morash and Attorney—to induce the City to assign the City Lien—misled the City by suggesting that they had a third-party buyer who was ready, willing, and able to close on the sale of the Property after the Foreclosure.  Morash knew (as he stated in his November 5, 2018 email to the City)[55] that the City would want a new owner that had the time and resources to keep the Property leased and maintained.  Morash and Attorney knew that no such buyer existed at the time, but they misrepresented the facts to the City (for example,

---

[50] Pl.'s Ex. 23.

[51] Id.

[52] 7/20/20 hrg. at 11:25 a.m.–11:30 a.m.

[53] 7/21/20 hrg. at 9:56 a.m.-9:57 a.m.

[54] 7/21/20 hrg. at 9:57 a.m.

[55] Pl.'s Ex. 15.

19

that a "back up contract went hard") to induce the City to assign the City Lien to Silver State so it could then foreclose the City Lien on the Property on January 2, 2019.

q)     Later that day, December 7, 2018, Attorney again emailed the City: "Maleshia, As discussed 7901 Blvd. 26, LLC will pay $180,000 by cash by wire for an assignment of the lien provided the assignment can be executed and scanned to me by Tuesday at 5p by someone with authority (which I presume to be the City Secretary). Please let me know if agreeable and send me wire instructions. Thanks[.]"[56] Morash admitted at trial that the reason he wanted the City Lien assigned by Tuesday, December 11, 2018 was so that Silver State could foreclose on the Property on January 2, 2019 (at least 21 days from December 11, 2018).[57]

r)     The City executed and emailed to Attorney the assignment documents at 3:55 p.m. on Tuesday, December 11, 2018.[58] The executed documents for the assignment of the City Lien were not recorded until January 7, 2019 at 4:31 p.m.[59] The Substitute Trustee's Deed conveying the Property to Silver State was filed immediately after the *Assignment of Lien* was recorded.[60] The Court finds that the delay in filing the City Lien assignment documents in the real property records was to minimize the chance that Valley Ridge and Bagelman would discover the plot to foreclose on the Property.

---

[56] Pl.'s Ex. 24.

[57] 7/20/20 hrg. at 1:43–1:45 p.m. (Morash testimony and stipulation of counsel). Garvin testified that while foreclosures in Texas historically take place on the first Tuesday of each month, the Foreclosure took place—as allowed by the State of Texas—on Wednesday, January 2, 2019 due to the New Year's Day holiday on January 1, 2019. 7/20/20 hrg. at 2:35 p.m.–2:36 p.m.

[58] Pl.'s Ex. 25.

[59] Pl.'s Ex. 26 (document D219003759, recorded 1/7/2019 at 4:31 p.m.).

[60] Pl.'s Ex. 27 (document D219003760, recorded 1/7/2019 at 4:31 p.m.).

s) On December 12, 2018, Attorney, on behalf of Silver State, sent to Bodyguard a notice of default under the City Note, notifying Bodyguard that the City Note was accelerated and that unless Bodyguard paid all sums due and owing by December 19, 2018, Silver State intended to foreclose on the Property on Wednesday, January 2, 2019.[61]  Attorney copied 7901 on the notice.[62]

t) Even though the Second Lien Deed of Trust for the City Lien required 30 days' notice of default to 7901 and the opportunity to cure the default, Morash, on 7901's behalf, executed a "WAIVER" that waived Silver State's requirement (as the holder of the loan documents) to give 7901 30 days' notice of default and the right to cure.[63]  After considering the documentary evidence and the testimony of the witnesses, the Court finds and concludes that Attorney prepared the waiver,[64] and Morash signed the waiver, so that Silver State could foreclose one month sooner than it otherwise would have been entitled to, thereby decreasing the chance that Valley Ridge and the inquisitive Bagelman would discover the planned sale of the Property at the Foreclosure and the risk that Valley Ridge could exercise its rights to try to enjoin the Foreclosure or to file an involuntary bankruptcy petition against 7901.

u) On December 13, 2018, after receiving from Attorney on that day supplemental responses to Valley Ridge's post-judgment discovery, Bagelman asked Attorney for an update on the potential sale of the

---

[61] Pl.'s Ex. 28.

[62] *Id.*

[63] Defs.' Ex. PP.

[64] Defs.' Ex. NN (Dec. 18, 2018 email from Attorney to Morash, attaching draft waiver:  "Dick, please see attached for your signature. We will call you this afternoon.").

Property.[65]  Attorney did not mention the assignment of the City Lien and City Loan to Silver State or the notice of foreclosure sale sent by Attorney the day before.  Instead, Attorney replied, "My understanding is that the buyer has not agreed to final terms.  In any case, I will look into it and let you know."[66]

v)  On January 7, 2019 at 3:45 p.m., after the Foreclosure had taken place and roughly 45 minutes before the assignment of the City Lien and the Substitute Trustee's Deed conveying the Property to Silver State were filed,[67] Bagelman asked Attorney by email for an update on a contract and the sale of the Property.[68] Attorney replied the next day, "Checking, will let you know."[69]  Attorney replied again on January 11, 2019, noting that Morash was travelling but that Morash would be available later in the month and thereafter through May.[70]

w)  Bagelman again asked Attorney for an update on January 16, 2019, and Attorney replied, "I was told that the potential buyer went silent."[71]

x)  So, despite repeated requests from Bagelman for updates about the potential sale of the Property, and despite Attorney's repeated promises that he would look into things and keep Bagelman posted, Attorney never once mentioned the planned sale of the Property at the January 2, 2019 Foreclosure, or (after the

---

[65] Pl.'s Ex. 29.  The discovery responses are not included in this exhibit, but based on Attorney's testimony at trial, 7901 and Attorney—although they apparently supplemented *some* discovery responses—never supplemented the discovery response to interrogatory No. 12 to reflect that Silver State was now the holder of the City Note and City Lien.  Had 7901 and Attorney supplemented the response to interrogatory No. 12, Valley Ridge and Bagelman likely would have discovered what was happening with the planned Foreclosure.

[66] Pl.'s Ex. 29.

[67] Pl.'s Ex. 30.

[68] Pl.'s Ex. 31.

[69] *Id.*

[70] *Id.*

[71] Pl.'s Ex. 32.

fact) that Silver State had foreclosed on the Property and bought it at the foreclosure sale.  Attorney could have refused to provide information to Bagelman and simply remained silent the whole time, thus not revealing information that might be harmful to his clients (or at least to clients Silver State and Morash).  But by promising to keep Bagelman posted and thereafter providing only select information about a potential sale of the Property, while simultaneously assisting Silver State and Morash in preparing for the Foreclosure sale, Attorney intentionally misled Bagelman.  Based on all the evidence and the circumstances surrounding these events, the Court finds that Attorney and Morash worked together to purposefully mislead Bagelman, Valley Ridge, and the City.

y)    At the July 24, 2019 hearing on the involuntary petition against 7901, Morash testified that he was not surprised that nobody outbid Silver State at the Foreclosure auction because it was a "complicated property," and that there was a less than 50% chance somebody else would purchase the Property at the foreclosure because "I didn't think anybody had enough information to make an informed bid on it."[72]  That portion of Morash's testimony at the involuntary-petition trial was credible.

z)    At the trial under consideration, however, Morash directly contradicted his earlier testimony and testified that he was surprised nobody else came and bid at the auction.[73]  That portion of Morash's testimony at this trial was not credible.

47.    At the time immediately prior to the Foreclosure, the Frost Lien securing the Frost Loan was in the amount of $3,236,995.55.  This lien was superior to the City Lien and to the lien of Valley Ridge, assuming

---

[72] Case No. 19-40989, ECF No. 40, July 24, 2019 Hrg. Tr. at 51–52.

[73] 7/20/20 hrg. at 3:57 p.m.–3:58 p.m.

that the City Lien was valid and enforceable at that time.

48.     At the time immediately prior to the Foreclosure, Valley Ridge held a lien against the Property in the amount of $508,633.49, plus per diem interest under the Judgment.

a)     With 8% interest on its judgment, Valley Ridge held a lien against the Property as of the date of the Foreclosure of $534,385.67.[74]

b)     At the time immediately prior to the Foreclosure, Tarrant County held a lien against the Property in the amount of $99,508.99.[75]

c)     At the time immediately prior to the Foreclosure, Silver State held a lien against the Property in the amount of $206,252.88.[76]

## D. THE SALE AND OTHER MATTERS

49.     Valley Ridge learned of the Foreclosure on or about February 15, 2019.

50.     On February 26, 2019, Valley Ridge amended the State Court Proceeding to add Silver State as a defendant and asserted various claims and causes of action against Silver State and 7901 to avoid the Foreclosure under the Texas Fraudulent Transfer Act.

51.     On or about February 22, 2019, Silver State, as seller, and Weby Corp or its assignee, as buyer, entered into that certain Commercial Contract of Sale (the "*Sale Contract*") to sell and purchase the Property for $4.3 million, including all furniture, fixtures, and equipment located on the Property.

---

[74] *Trial Brief of Silver State and Richard Morash*, Adv ECF No. 87 ("***Defendants' Trial Brief***") ¶ 40.  This figure matches the Court's calculations.

[75] Defendants' Trial Brief ¶ 40.

[76] Defendants' Trial Brief ¶ 40.

52.     Silver State filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on April 18, 2019.

        a)     In Silver State's sworn bankruptcy schedules, Silver State valued the Property at $4.2 million.[77]

53.     Immediately after the filing of the bankruptcy petition, Silver State removed the State Court Proceeding to this Court.

54.     The primary reason Silver State filed its bankruptcy petition was to effectuate the Sale Contract pursuant to the "free and clear" sale provisions of the Bankruptcy Code.

55.     On April 26, 2019, Silver State filed its motion to sell the Property.  The Court held a hearing on that motion on May 20, 2019.  On May 22, 2019, the Court entered the Sale Order approving the sale of the Property under the Sale Contract for the contracted $4.3 million (the "*Sale*").

56.     The buyer under the Sale Contract and in the Sale was a third party, wholly unrelated to Morash, 7901, or Silver State.

57.     The Sale closed on or about June 14, 2019.

58.     Under the Sale Order, and from the proceeds of the Sale, Silver State paid the liens and claims of Tarrant County and Frost in full, as well as $100,000.00 to Tom Bean Bank, and various ordinary and customary closing costs (including real estate commissions), leaving a net amount of proceeds remaining of $627,050.37.

59.     Pursuant to the Sale Order and subsequent orders of the Court, Silver State deposited $627,050.37 into the Registry of the Court.

---

[77] Case No. 19-41579, ECF No. 19, at 5/17.

a)      The Court finds and concludes that the value of the Property at the time of the Foreclosure was $4.2 million (after deducting the $100,000 paid to Tom Bean Bank to settle the issue of the Tom Bean Fixture Filing).  In making this determination, the Court considered—and gave the appropriate weight to—all relevant evidence, including (but not limited to) the following:

- The $4.2 million value placed on the Property in the Silver State bankruptcy schedules.

- The Sale Contract and Sale Order and the closing of the sale of the Property.

- The failure of the March 2018 Contract to close.

- The testimony of Jason Jackson and the corresponding Appraisal of Real Property prepared by Integra Realty Resources,[78] which valued the Property at $4,880,000 as of March 15, 2019.

- The testimony of Derek Schuster, the broker with Weitzman Group who marketed the Property and helped with the ultimate sale of the Property, and the "marketing progress" he prepared.[79]

- The evidence—or lack of evidence—of any change in market conditions for the Property between the time of the Foreclosure, the execution of the Sale Contract, and the closing of the sale of the Property.

- The conflicting testimony regarding what effect, if any, a pending foreclosure has on the sale price of real property, and what effect, if any, a pending bankruptcy has on the sale

---

[78] Pl.'s Ex. 42.

[79] Defs.' Ex. CC.

26

price of real property.

60.    On March 6, 2019, Valley Ridge filed an involuntary petition against 7901 pursuant to 11 U.S.C. § 303, initiating Bankruptcy Case No. 19-40989.

a)    7901 contested the involuntary petition, and also filed a motion asking the Court to abstain from hearing the involuntary petition, arguing that Valley Ridge was sufficiently protected by asserting its Texas state law claims in Texas state court.[80]  After considering the arguments made by 7901 in connection with the involuntary petition and the motion to abstain, and after considering the evidence in this trial, the Court finds and concludes that 7901 contested the involuntary petition, and asked for abstention, at least in part to prevent a bankruptcy trustee from asserting claims, on behalf of 7901's bankruptcy estate, against Silver State under Bankruptcy Code §§ 547 and 548.  Allowing a trustee (or a successor to the trustee, such as Valley Ridge) to assert such claims would increase the chance that Valley Ridge would recover on its claim because the Bankruptcy Code preference and fraudulent-transfer provisions are not as limited as similar claims under Texas law.[81]

61.    A trial on the involuntary petition was held on July 24, 2019.

62.    On August 8, 2019, the Court issued its ruling on the involuntary petition on the record, and an Order for Relief in an Involuntary Case was entered in 7901's Chapter 7 bankruptcy case.

63.    By its order entered January 29, 2020, the Court confirmed Silver State's Chapter 11 plan of liquidation, which became effective on February 3, 2020.

---

[80] *See, e.g.,* Case No. 19-40989, ECF No. 15 (7901's motion to abstain); ECF No. 21 (7901's reply in support of motion to abstain); ECF No. 33 (7901's trial brief contesting involuntary petition).

[81] Just a few examples:  Texas law has nothing that is comparable to the comprehensive provisions regarding preferential transfers found in Bankruptcy Code § 547.  In addition, as explained below, the Texas fraudulent-transfer statute—unlike § 548 of the Bankruptcy Code—limits the avoidance of fraudulent transfers to unencumbered assets or encumbered assets with equity.

64.     After a settlement between Silver State, Valley Ridge, and the 7901 Chapter 7 Trustee, pursuant to which the 7901 Chapter 7 Trustee was paid $50,000.00 from the funds in the Registry of the Court, $577,050.37 remains so deposited.  Silver State and Valley Ridge are the only parties remaining with claims and interests to these funds.

65.     On January 8, 2020, the Court entered an Agreed Order Approving Inter-Estate Compromise and Settlement which, among other things, ordered that all claims and causes of action asserted by the 7901 Chapter 7 Trustee in the Second Amended Complaint in this case against Silver State and Morash were assigned to Valley Ridge.

      a)     As of July 20, 2020, Valley Ridge is owed $597,261.03 on the Judgment.

## V.     ANALYSIS

Valley Ridge seeks avoidance of the Foreclosure, recovery of the Registry Funds, and other damages under various legal theories.  The Court will address Valley Ridge's claims in turn.  The Court also will address Silver State's counterclaims.[82]

### A.  Section 547 Preference

Valley Ridge seeks to avoid the Foreclosure as a preferential transfer under Bankruptcy Code § 547.  With exceptions not relevant here, Valley Ridge, as the successor to the 7901 Chapter 7 Trustee, may—

avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;

---

[82] The Parties have agreed that the quantification of any attorney's fees and costs award that the Court may issue will be determined through post-trial procedures under Federal Civil Rule 54(d).  *Joint Pretrial Order* at 21, Adv. ECF No. 83.

    (4) made—
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such
        creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if—
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions
        of this title.[83]

For the reasons described below, the transfer of the Property to Silver State through the Foreclosure satisfies the

elements of a preferential transfer under § 547.

First, the Foreclosure is a transfer of 7901's interest in the Property.  The Bankruptcy Code defines

"transfer" broadly to include—

    (A) the creation of a lien;
    (B) the retention of title as a security interest;
    (C) the foreclosure of a debtor's equity of redemption; or
    (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or
    parting with—
        (i) property; or
        (ii) an interest in property.[84]

The Foreclosure of the Property meets the definition of "transfer" in two ways.  First, the Foreclosure of the

Property eliminated 7901's equity of redemption, or its right to redeem the Property by paying the full amount

---

[83] 11 U.S.C. § 547(b).

[84] 11 U.S.C. § 101(54).

due prior to foreclosure.[85]  Second, the Foreclosure was an involuntary mode of 7901's parting with the Property.[86]

Second, the transfer of the Property through the Foreclosure was to *and* for the benefit of Silver State, a creditor.

Third, the transfer of the Property through the Foreclosure was for or on account of an antecedent debt—*i.e.*, the April 2017 Note—owed by 7901 to Silver State before the transfer was made.

Fourth, the transfer of the Property through the Foreclosure was made while 7901 was insolvent.  7901 is presumed to have been insolvent in the 90 days prior to the involuntary petition bankruptcy filing,[87] and Silver State did not rebut that presumption.  In fact, the evidence established 7901's insolvency conclusively.

7901 was insolvent if the sum of 7901's debts was greater than all of 7901's property, at a fair valuation, exclusive of property transferred with intent to hinder, delay, and defraud creditors, and exclusive of exempt property.[88]  Even if 7901 did not intend to defraud creditors (thus requiring that the Property be included in the calculation), 7901's debts were greater than any fair valuation of 7901's assets, including the Property.  7901's sworn bankruptcy schedules reflect total unsecured claims of $4,955,584.66 as of the bankruptcy petition date of

---

[85] *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 & n.7 (1994) (noting that a 1984 amendment to the Bankruptcy Code expanded the definition of "transfer" to include "foreclosure of the debtor's equity of redemption," thus establishing "that foreclosure sales fall within the general definition of 'transfers' that may be avoided under several statutory provisions, including (but not limited to) § 548."); *Scott v. Dorothy B. Schneider Estate Tr.*, 783 S.W.2d 26, 28 (Tex. App. 1990) (noting that under the doctrine of equity of redemption, a party must be ready, willing, and able to satisfy the debt prior to foreclosure, which terminates the equity of redemption).

[86] *In re Criswell*, 102 F.3d 1411, 1415 (5th Cir. 1997) ("[T]he definition of 'transfer' under the Bankruptcy Code is comprehensive and includes every conceivable mode of alienating property, whether directly or indirectly, voluntarily or involuntarily.").  Silver State asserts a "Global Defense" that the foreclosure cannot be avoided under TUFTA because the foreclosure was not a transfer "by a debtor," and cannot be avoided under the Bankruptcy Code because no "debtor . . . made such transfer."  *See* Defendants' Trial Brief ¶¶ 25-33, at 14-18.  Silver State's global argument appears to be limited to the actual and constructive fraudulent-transfer counts, since the relevant fraudulent-transfer statutes contain that language.  Section 547 has no similar language, but even if it did, the foreclosure was an involuntary transfer by the debtor within the meaning of both TUFTA and the Bankruptcy Code, for the reasons explained in this Order.

[87] 11 U.S.C. § 547(f).

[88] 11 U.S.C. § 101(32).  7901 is not entitled to exempt property, so the second exclusion does not apply.

March 6, 2019 (just two months after the foreclosure).[89] The same schedules reflect only $799.89 in a Frost Bank money market account on the petition date, and 7901's sworn statement of financial affairs do not reflect any money transfers to creditors in the 90 days prior to the bankruptcy filing.[90]

Therefore, on the date of the Foreclosure, 7901 owned the Property and $799.89. The Court has already determined that the value of the Property at the time of the foreclosure was $4.2 million. But even if the Court were to adopt the valuation of the Property by Valley Ridge's expert[91] (the highest potential value), that $4,880,000 value, plus the $799.89 in the Frost Bank money market account, totals $4,880,799.89, which still is less than 7901's debts of $4,955,584.66, and is also less (by a whisker) than 7901's total undisputed debts of $4,888,527.94. 7901 was insolvent at the time of the Foreclosure.

Fifth, both the Foreclosure and the filing of the substitute trustee's deed occurred within 90 days of the involuntary petition date.

Finally, the transfer of the Property through the Foreclosure allowed Silver State to receive more than it would have received had the transfer not occurred and had Silver State received payment of its debt in a hypothetical Chapter 7 bankruptcy. Silver State's expert, Scott Seidel—himself an experienced Chapter 7 trustee—testified that Silver State would have received nothing in a hypothetical Chapter 7 because the Chapter 7 trustee (after considering the liens on the Property and the costs of administration) would have abandoned the Property, and Frost Bank, the senior secured creditor, would have obtained relief from the automatic stay to

---

[89] Case No. 19-40989, ECF No. 49, at 8-9/12. Of those claims, $4,888,527.94 were undisputed and $67,056.72 were disputed. 7901 also listed The First National Bank of Tom Bean with a disputed claim of "unknown" amount.

[90] Case No. 19-40989, ECF No. 48, at 1/7.

[91] Pl.'s Ex. 42 (Integra Realty Resources Appraisal Report).

foreclose on the Property, wiping out Silver State's lien.   That part of Mr. Seidel's testimony—and the corresponding conclusion in his expert report—is credible.[92]   In other words, Silver State would have received nothing in a Chapter 7 bankruptcy of 7901.   But Silver State received more than nothing (that is, it received more than it would have received in a Chapter 7) when it foreclosed on the Property, wiped out Valley Ridge's lien, and obtained the Property worth $4.2 million, subject only to the Frost Bank and Tarrant County liens.   In other words, Silver State netted $863,495.46[93] more than it would have received in a 7901 Chapter 7.

For these reasons, the transfer of the Property through the Foreclosure was a preference and may be avoided under § 547.   To avoid this straightforward conclusion, Silver State makes several arguments, none of which have merit.

First, according to Silver State, if Valley Ridge argues that the Property was worth more than the liens against it, then Valley Ridge cannot simultaneously argue that 7901 was insolvent.[94]   This argument confuses insolvency with equity in the Property.   A debtor with an unsecured billion-dollar judgment against him can be insolvent even if he owns a $100,000 house that is subject to a lien of only $75,000.   Likewise, 7901 can be, and was, insolvent at the time of the Foreclosure when the total debts against it exceeded the total value of all its assets, even if the total liens against the Property were less than the value of the Property.

---

[92] Other conclusions in the report, as explained below, are not persuasive.

[93] $4.2 million gross value, less the Frost Bank lien of $3,236,995.55, less the Tarrant County lien of $99,508.99.   Even if Silver State (contrary to the Seidel report) would have been paid in full on its $206,252.88 claim in a 7901 Chapter 7, it still received a preference of $657,242.58, the difference between what it would have received in the Chapter 7 ($206,252.88) and what it actually received through the foreclosure ($863,495.46).   This lesser preference amount of $657,242.58 exceeds the $577,050.37 in the registry of the Court.

[94] Defendants' Trial Brief ¶ 63, at 32.   This precise argument was made in response to the claim under TUFTA § 24.006(b), but this rationale applies equally to the bankruptcy preference claim.   In other words, Silver State argues that 7901 cannot be insolvent if the claims against the Property are less than the value of the Property.

Second, Silver State cites two Fifth Circuit cases for the proposition that—as a matter of law—a secured creditor that merely recovers its own collateral does not receive a preference.[95]  But the *El Paso Refinery* and *Tusa-Expo* cases dealt with *undersecured* creditors who received payments prior to bankruptcy from their own collateral.  In that context, the Fifth Circuit concluded there were no preferential transfers under § 547(b)(5) because the undersecured creditors would have recovered on their collateral in a hypothetical Chapter 7 in any event, so the payments did not enable the undersecured creditors to receive more than they would have received in a Chapter 7.

This case, in contrast, deals with unusual facts.  Here, an oversecured, third-priority creditor that would have received *nothing* in a Chapter 7 (that is, it would *not* have recovered on its collateral in the Chapter 7), received substantial equity in the Property as a result of the Foreclosure.  The *El Paso Refinery* and *Tusa-Expo* cases simply are not on point.

Third, Silver State argues, through its briefing and through the Seidel expert report, that even if the technical elements of a preference are present, a regularly conducted, noncollusive foreclosure sale cannot be avoided as a preference under the Supreme Court *BFP* case[96] because Silver State—as a matter of law—paid reasonably equivalent value for the Property,[97] the same result (argues Silver State) that would have occurred in a Chapter 7.[98]  Silver State's analysis is faulty because it ignores Mr. Seidel's conclusion (which the Court agrees

---

[95] Defendants' Trial Brief at 28-29 (citing *Krasfur v. Scurlock Permian Corp. (In re El Paso Refinery LP)*, 171 F.3d 249, 255 (5th Cir. 1999); *Garner v. Knoll Inc. (In re Tusa-Expo Holdings Inc.)*, 811 F.3d 786, 793 (5th Cir. 2016)).

[96] *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994).

[97] For purposes of the preference analysis only, the Court will assume that the foreclosure sale was regularly conducted and noncollusive.

[98] Defendants' Trial Brief ¶¶ 59-60, at 30-31; Defs.' Ex. Z, Expert Report of Scott M. Seidel, at 12-13 & n.7 (citing *In re Visba Forwarding Inc.*, 244 B.R. 94, 96 (S.D. Tex. 1999) ("If the price received at a foreclosure is reasonably equivalent to the value of the

with) that under these unique facts, Silver State, a creditor with a third-priority lien on the Property, would have received *nothing* in a Chapter 7 of 7901 because Silver State would *not* have been able to foreclose; Frost Bank instead would have foreclosed and wiped out Silver State's lien.  Silver State is wrong to suggest—contrary to its own expert's conclusion—that it would have foreclosed on the Property in a Chapter 7 just as it did prior to 7901's bankruptcy.

Fourth, Silver State argues that calamity—measured in billions of dollars—will ensue if state law foreclosure sales are potentially subject to preference attack, and under the *BFP* decision, public policy requires that preference law give way to the finality of state-law foreclosure sales.[99]  The plain language of § 547 precludes Silver State's argument.  The Supreme Court in *BFP* held that the price received at a regularly conducted, noncollusive mortgage foreclosure sale conclusively established "reasonably equivalent value" of mortgaged property for purposes of a constructively-fraudulent-transfer claim under § 548(a)(1)(B).  *BFP* noted that bankruptcy courts should not interpret a Bankruptcy Code provision in a manner that interferes with state real property concerns absent unambiguous statutory language.[100]  In reaching its decision, the Supreme Court considered the public policy of state-law-foreclosure-finality only because it found the term "value" in "reasonably equivalent value" ambiguous.  There is no ambiguity in § 547(b)(5).  That provision does not use the

---

property sold, then parity of reasoning would suggest that such a foreclosure sale would not have the effect of 'enabling such creditor to receive more than such creditor would receive' in a chapter 7.  In other words, the creditor received reasonably equivalent value at the foreclosure sale *and that is what the creditor could expect in a Chapter 7*.") (emphasis added)).

[99] Some courts support Silver State's argument.  *See, e.g.*, *In re FIBSA Forwarding, Inc.*, 230 B.R. 334, 337 (Bankr. S.D. Tex.), aff'd, 244 B.R. 94 (S.D. Tex. 1999); *In re Pulcini*, 261 B.R. 836, 844 (Bankr. W.D. Pa. 2001); *In re Cottrell*, 213 B.R. 378, 383 (Bankr. M.D. Ala. 1996).

[100] *BFP*, 511 U.S. at 544 ("To displace traditional state regulation in such a manner, the federal statutory purpose must be 'clear and manifest'").

term "reasonably equivalent value."  It instead asks whether a creditor received "more" through a challenged transfer than it would have received in a Chapter 7 of the debtor had the transfer not been made.  There is no question here that Silver State received more through the Foreclosure than it would have received in a Chapter 7 of 7901 had the Foreclosure not occurred.  "[W]hen the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms."[101] The Court agrees with the well-reasoned opinions of colleagues who have concluded that there is no *per se* rule under *BFP* that a foreclosure can never be a preference.[102]  In this case, the foreclosure *was* a preference.

## B.  Section 548(a)(1)(A) actual fraudulent transfer

Valley Ridge also seeks to avoid the Foreclosure as an actual fraudulent transfer under Bankruptcy Code § 548(a)(1)(A).  Section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to

> avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer . . . with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .[103]

---

[101] *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal citations and quotations omitted).  Even if the Court were to reach Silver State's public-policy argument, its concerns are wildly exaggerated.  The Court is not aware of any calamitous effect on Texas foreclosures (and Silver State points to none) after two bankruptcy courts in the Fifth Circuit (cited in the next footnote) concluded a decade ago that Texas state law foreclosures can—under certain facts—be avoided as a preference under § 547.

[102] *In re Whittle Development, Inc.*, 463 B.R. 796 (Bankr. N.D. Tex. 2011); *In re Villarreal*, 413 B.R. 633 (Bankr. S.D. Tex. 2009); *In re Rambo*, 297 B.R. 418 (Bankr. E.D. Pa. 2003); *cf. Hackler v. Arianna Holdings, LLC (In re Hackler & Stelzle-Hackler)*, 938 F.3d 473, 477-78 (3d Cir. 2019) (concluding that *BFP* did not apply to tax foreclosures and that under the plain language of § 547, tax sale purchaser with a $45,000 tax lien received a preference when it acquired property worth $335,000 through foreclosure:  "Unless there is ambiguity, we 'cannot allow policy to guide our analysis.'  Here, the statute is unambiguous.  Applying its straightforward terms does not lead us to an absurd result.  Thus, our reading of it ends there.") (internal citations omitted).

[103] 11 U.S.C. § 548(a)(1)(A).

35

For the reasons described below, the transfer of the Property to Silver State through the Foreclosure satisfies the elements of an actual fraudulent transfer under § 548(a)(1)(A).

To begin, the Foreclosure is a "transfer"[104] of 7901's interest in the Property, for the same two reasons described above in the discussion of § 548. The foreclosure of the Property eliminated 7901's equity of redemption, or its right to redeem the Property by paying the full amount due prior to foreclosure.[105] In addition, the Foreclosure was an involuntary mode of 7901's parting with the Property.[106]

Second, the transfer of the Property through the Foreclosure occurred within two years of 7901's involuntary bankruptcy petition date.

Third, 7901—"voluntarily or involuntarily"—made the transfer with actual intent to hinder, delay, or defraud a creditor—in this case, Valley Ridge. The requirement is disjunctive: any one of the three intents (hinder *or* delay *or* defraud) is sufficient for liability.[107] Section 548(a)(1)(A)'s language requires proof of "actual" intent, which in turn requires proof of the debtor's subjective state of mind.

---

[104] 11 U.S.C. § 101(54).

[105] *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 & n.7 (1994) (noting that a 1984 amendment to the Bankruptcy Code expanded the definition of "transfer" to include "foreclosure of the debtor's equity of redemption," thus establishing "that foreclosure sales fall within the general definition of 'transfers' that may be avoided under several statutory provisions, including (but not limited to) § 548."); *Scott v. Dorothy B. Schneider Estate Tr.*, 783 S.W.2d 26, 28 (Tex. App. 1990) (noting that under the doctrine of equity of redemption, a party must be ready, willing, and able to satisfy the debt prior to foreclosure, which terminates the equity of redemption).

[106] *In re Criswell*, 102 F.3d 1411, 1415 (5th Cir. 1997) ("[T]he definition of 'transfer' under the Bankruptcy Code is comprehensive and includes every conceivable mode of alienating property, whether directly or indirectly, voluntarily or involuntarily."). Silver State asserts a "Global Defense" that the foreclosure cannot be avoided under TUFTA because the foreclosure was not a transfer "by a debtor," and cannot be avoided under the Bankruptcy Code because no "debtor . . . made such transfer." *See* Defendants' Trial Brief ¶¶ 25–33. Silver State's global argument appears to be limited to the actual and constructive fraudulent-transfer counts, since the relevant fraudulent-transfer statutes contain that language.

[107] 5 Collier on Bankruptcy ¶ 548.04 (16th 2020); *see also In re Perez*, 954 F.2d 1026, 1028 (5th Cir.1992) (affirmed bankruptcy court's finding based on circumstantial evidence that property was transferred "with the intent to, if not defraud [debtor's] creditors, at least hinder or delay their discovery of and access to certain assets").

Because a court cannot expect a debtor to admit his or her intent to hinder, delay, or defraud under oath, courts

look to badges of fraud as circumstantial evidence of a debtor's subjective state of mind. These include—

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred;
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor;
> (12) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
> (13) the general chronology of events and transactions under inquiry.[108]

Not all, or even a majority, of the "badges of fraud" must exist to find actual fraud; instead, "[w]hen several of

these indicia of fraud are found, they can be a proper basis for an inference of fraud."[109]

Here, several badges of fraud are present to justify an inference of intent to hinder, delay, or defraud.

---

[108] *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008) (quoting *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)); *In re 1701 Commerce, LLC*, 511 B.R. 812, 836 & n. 198 (Bankr. N.D. Tex. 2014); *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 263 (Bankr. N.D. Tex. 2003). These badges of fraud include 11 badges listed in TUFTA. Tex. Bus. & Comm. Code § 24.005(b).

[109] *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir.1988); *Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 19, 26 (S.D. Tex. 2014).

First, the Property was transferred from a single-member LLC controlled by Morash (7901) to another single-member LLC controlled by Morash (Silver State). Given the close relationship between the parties and the common control over both entities by Morash, the transfer was to an insider.[110]

Second, the transfer of the Property was concealed. It is true that Garvin provided notice of the foreclosure to 7901 and posted notice with Tarrant County. It is also true that on January 7, 2019, after the foreclosure, Garvin (or somebody else acting for Silver State) filed the Substitute Trustee's Deed conveying title to the Property. So, in that sense the transfer was not concealed. But the transfer was concealed in the real-world sense based on (a) Attorney's multiple promises to keep Bagelman updated on a potential sale of the Property, while Attorney and Morash simultaneously and surreptitiously acquired the City Lien in a rush to foreclose for Silver State before Bagelman and Valley Ridge could discover what was happening; and (b) 7901's failure to supplement its interrogatory response to list Silver State as the new holder of the City Lien and City Loan.[111]

Third, before the transfer of the Property, 7901 had been sued by Valley Ridge, which was pursuing remedies to try to collect on its Judgment.

Fourth, the transfer of the Property was of substantially all of 7901's assets.

Fifth, 7901 "removed" assets by acquiescing in an expedited foreclosure of the Property despite its rights under the Second Lien Deed of Trust for the City Lien to have 30 days' notice of default and the opportunity to cure. The Court does not give significant weight to this badge of fraud because—in the Court's view—to say that

---

[110] *See, e.g., Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992) (non-statutory insider is born when a transferee has a "sufficiently close" relationship with a debtor, which may be based on control or influence over the debtor, such that any dealings between the debtor and the transferee are not at arm's length).

[111] Even if the transfer of the Property should not be considered concealed under these circumstances, the Court still would conclude, based on the other badges of fraud and the evidence as a whole, that 7901 intended to hinder, delay, or defraud Valley Ridge.

7901 "removed" assets is simply another way of saying that the Property was transferred through the Foreclosure. 7901's intent is demonstrated by the confluence of the other badges of fraud.

Sixth, 7901 was insolvent before the transfer of the Property and was rendered even more insolvent after the transfer.

Seventh, the general chronology of events and transactions under inquiry demonstrate that 7901 intended to hinder, delay, or defraud Valley Ridge before, during, and after the transfer of the Property. Acting through both Attorney and Morash, 7901 intended to hinder and delay Valley Ridge by misleading Bagelman with select tidbits of information and misinformation about a potential sale of the Property, while Attorney and Morash—now conveniently acting for Silver State—simultaneously orchestrated an expedited acquisition of the City Lien (through misrepresentations to the City) to accomplish the ultimate goal: through execution of a waiver, permitting the Property to be posted for foreclosure sooner than would have otherwise been permitted under the loan documents, and allowing Silver State to acquire the Property through foreclosure, thereby scrubbing the Property of "historical liens" and further hindering and delaying Valley Ridge's collection efforts.[112] Although the relevant focus is 7901's intent at the time of the transfer, it is telling that even after the foreclosure, 7901 fought tooth and nail to prevent a 7901 bankruptcy, which could lead to an unwinding of the transaction under §§

---

[112] These same circumstances also demonstrate an intent to defraud through nondisclosure. "Fraud by omission is a subcategory of fraud because an omission or nondisclosure may be as misleading as a positive misrepresentation of fact when a party has a duty to disclose." *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App. – Houston [14th Dist.] 2007, no pet.). The duty to disclose may arise (1) when the parties have a fiduciary relationship; (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth; (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue; or (4) when one party makes a partial disclosure and conveys a false impression which gives rise to the duty to speak. *Id*. Circumstances (2)-(4) appear to be present in 7901's selective disclosures to Valley Ridge about a potential sale of the Property, as well as in 7901's failure to supplement its interrogatory response to list Silver State as the new holder of the City Lien and City Loan.

547 and 548 of the Bankruptcy Code. In other words, 7901's intent to hinder and delay Valley Ridge was continuous and uninterrupted.

The confluence of these badges of fraud leads to the inescapable conclusion that 7901 intended to hinder, delay, or defraud Valley Ridge. In making this determination, the Court also considered the credibility and demeanor of the various witnesses. All of the elements of an actual fraudulent transfer under § 548(a)(1)(A) are present. Silver State tries to avoid this conclusion with several arguments, none of which have merit.

First, Silver State argues that Morash simply outsmarted and "snookered" Valley Ridge and that nothing Morash and Silver State did was fraudulent or objectionable—all they did was foreclose (allegedly) in compliance with state law.[113] Morash wore five or more hats during these events. He acted for 7901. He acted for Silver State. He acted for D.F. Land. He acted for Morash Family Limited Partnership. He acted for himself. The Court's findings describe those actions because they tell the whole story. But the Court's focus is not on the intent of Silver State, D.F. Land, Morash Family Limited Partnership, or Morash in his individual capacity. For purposes of this actual-fraudulent-transfer count, the Court's focus is on 7901 and whether 7901 intended to hinder, delay, or defraud Valley Ridge. The evidence demonstrates that 7901—acting through *its* agents, including Morash and Attorney—intended to hinder, delay, or defraud Valley Ridge.

Second, Silver State argues that the transfer of the Property through the Foreclosure cannot be avoided under § 548 because 7901 did not make the transfer. In other words, § 548 allows for avoidance "if the debtor voluntarily or involuntarily . . . made such transfer . . ."), but according to Silver State, 7901 did not make the

---

[113] Silver State makes the same argument with respect to the actual-fraudulent-transfer count under Texas law. After addressing the argument here, the Court will not repeat it below when discussing the Texas statute.

transfer—Garvin did. The Court rejects this myopic view of the statute. As the Court has noted twice now, Bankruptcy Code § 101(54) defines "transfer" broadly to include foreclosure of a debtor's equity of redemption (exactly what happened here) and "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with" property or an interest in property (again, exactly what happened here). The Foreclosure is avoidable under the express terms of §§ 548 and 101(54).

Third, Silver State argues that 7901 did not have fraudulent or any other intent, "for 7901 did not intend to do anything because it did nothing."[114] 7901 did have intent, and it did plenty. Even before Silver State was formed, 7901 promised to provide updates to Valley Ridge on the potential sale of the Property, and those promises continued even after 7901 knew (with Morash wearing his 7901 hat) that Morash (wearing his own hat or the hat of a not-yet-formed entity) was trying to acquire the City Lien to wipe out Valley Ridge's "historical" lien. 7901 continued to provide Valley Ridge select and incomplete updates on a potential sale of the Property even after Silver State was formed and even after Silver State started the foreclosure process. 7901 also failed to supplement its interrogatory response to list Silver State as the new owner of the City Lien and City Loan. Then, knowing that the inquisitive Bagelman might soon discover what was happening, Morash (wearing his 7901 hat) signed a waiver that permitted Silver State to foreclose sooner than it otherwise would have been entitled to under the City loan documents. 7901 clearly intended to hinder, delay, or defraud Valley Ridge.

Fourth, Silver State argues that "there was a problem that needed to be solved" because—according to Silver State—the Property was not worth enough to pay off all liens, 7901 had run out of money, Morash wanted

---

[114] Defendants' Trial Brief ¶ 49. Silver State makes the same argument with respect to the actual-fraudulent-transfer count under Texas law. After addressing the argument here, the Court will not repeat it below when discussing the Texas statute.

to stop sinking his own money into the project, and the Property needed to be sold free and clear of liens to pay off as much debt as possible.[115]  As an initial matter, the Court rejects the notion that an actual fraudulent transfer could be the appropriate solution to a financial problem—the financial predicament of 7901 and Morash simply do not justify an actual fraudulent transfer and the misleading statements of 7901's agents and representatives to both the City and Valley Ridge.  Moreover, the Court disagrees with the suggestion that the Property was not worth enough to pay off all liens.  The Court has concluded that the Property was worth $4.2 million at the time of the foreclosure, while the total liens against the Property at that time were $4,051,390.91, leaving nearly $150,000 of equity in the Property.  Had 7901 entered into a Chapter 11 bankruptcy—through either a voluntary petition or involuntary petition—the evidence strongly suggests that 7901 could have found the same buyer and sold the Property for the benefit of its creditors, including Valley Ridge.

Morash protests that he had no obligation to continue putting money into the project or to fund a Chapter 11 bankruptcy filing by 7901.  The Court agrees.  But even if Morash refused to personally fund a Chapter 11 filing by 7901, there was still a possibility that 7901 could have successfully pursued a sale of Property.  Morash, however, prevented 7901 from pursuing a sale process for its creditors, because he wanted to try to capture the equity for himself instead.  In any event, although there may have been difficulties had 7901 taken a different approach to the matter, the Court is convinced that an actual fraudulent transfer was not the appropriate solution.[116]

---

[115] Silver State makes the same argument with respect to the actual-fraudulent-transfer count under Texas law.  After addressing the argument here, the Court will not repeat it below when discussing the Texas statute.

[116] *See Shapiro v. Wilgus*, 287 U.S. 348, 354–55 (1932) (debtor's transfer of all assets to newly formed corporation after creditor threatened to sue, in effort to obtain additional time to repay all creditors, was part of scheme to hinder or delay creditors).

Finally, Silver State argues that even if the Foreclosure is avoidable, Silver State is entitled to a defense under § 548(c):

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.[117]

Silver State is not entitled to this defense for two independent reasons. First, § 548(c) allows for the defense "except to the extent" that the transfer is voidable as a preference under § 547. The transfer of the Property through the Foreclosure is voidable to the same extent under both § 547 and § 548, so the defense is unavailable to Silver State. Second, even if the transfer were not voidable as a preference, Silver State can employ the defense only if it took "for value *and* in good faith."[118] Silver State is not entitled to this defense even if it gave some value for the transfer because Silver State did not take in good faith. Morash, wearing his Silver State hat, was aware that Morash, wearing his 7901 hat, intended to hinder, delay, or defraud Valley Ridge.[119] The § 548(c)

---

[117] 11 U.S.C. § 548(c). The burden of proof is on the defendant transferee. *Jimmy Swaggert Ministries v. Hayes (in Re Hannover Corp.)*, 310 F.3d 796, 799 (5th Cir. 2002).

[118] 11 U.S.C. § 548(c) (emphasis added).

[119] *In re Am. Hous. Found.*, 785 F.3d 143, 162–65 (5th Cir. 2015) (noting that § 548(c) defense requires value *and* good faith, which focuses on whether a transferee reasonably should have known of the fraudulent intent underlying the transfer) (citing *Horton v. Walter O'Cheskey (In re Am. Hous. Found.)*, 544 Fed. Appx. 516, 520 (5th Cir. 2013)); *see also* 5 Collier on Bankruptcy ¶ 548.09 (16th 2020) (*citing, e.g., Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 538 (9th Cir. 1990) (under section 548(a)(1)(A), "the entire transfer may be avoided, even if reasonably equivalent value was given, so long as the transferor actually intended to hinder, delay or defraud its creditors and the transferee accepted the transfer without good faith"); *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007) ("the entirety of the transfer is avoidable whether or not the debtor received value in exchange, and the plaintiff need not allege and prove that the transfer was for less than fair value if actual intent is alleged and proved under section 548(a)(1)(A)"); *and see also Gold v. First Tenn. Bank Nat'l Ass'n (In re Taneja)*, 743 F.3d 423, 430 (4th Cir. 2014) ("in evaluating whether a transferee has established an affirmative defense under Section 548(c), a court is required to consider whether the transferee actually was aware or should have been aware, at the time of the transfers and in accordance with routine business practices, that the transferor-debtor intended to 'hinder, delay, or defraud any entity to which the debtor was or became … indebted'").

defense is not available to Silver State.

## C. Actual fraudulent transfer under Bankruptcy Code § 544 and Texas Business and Commerce Code section 24.005(a)(1)

Valley Ridge also seeks to avoid the Foreclosure as an actual fraudulent transfer under Texas Business and Commerce Code section 24.005(a)(1) and § 544 of the Bankruptcy Code. Section 544 of the Bankruptcy Code allows a trustee (Valley Ridge, the 7901 Chapter 7 Trustee's successor) to avoid any transfer of an interest of the debtor in property that is voidable under applicable law by an unsecured creditor (Valley Ridge). Section 24.005(a)(1) of the Texas Business and Commerce Code provides that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor."[120] Section 24.005(b) then lists largely the same badges of fraud the Court discussed above with respect to § 548(a)(1)(A).[121]

After considering the same badges of fraud already discussed, the Court concludes (with an exception to be discussed shortly) that the transfer of the Property through the Foreclosure sale was fraudulent as to Valley Ridge because 7901 made the transfer—involuntarily—with the intent to hinder, delay, or defraud Valley Ridge.

Silver State makes three arguments against avoidance, only one of which has merit. First, Silver State argues that the transfer of the Property through the Foreclosure cannot be avoided under section 24.005(a)(1)[122] because 7901 did not make the transfer. In other words, section 24.005(a)(1) allows for avoidance "if the debtor

---

[120] TEX. BUS. & COMM. CODE § 24.005(a).

[121] TEX. BUS. & COMM. CODE § 24.005(b).

[122] Silver State makes the same argument under § 24.005(a)(2). The Court will address this argument here, only once.

made the transfer" with the requisite intent, but according to Silver State, 7901 did not make the transfer—Garvin did. The Court rejects this myopic view of the statute, just as it did with the similarly worded § 548. Texas Business and Commerce Code section 24.002(12) defines "transfer" broadly to include both voluntary and involuntary transfers.[123] Moreover, the Texas statute gives a constructive-fraudulent-transfer defendant the presumption that it gave reasonably equivalent value for property "if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale . . . ."[124] This defense does not directly apply to this actual-fraudulent-transfer count, but the statute as a whole makes clear that an involuntary foreclosure is a "transfer" because otherwise there would be no need to provide for a foreclosure-specific defense in the constructive-fraudulent-transfer context. The Foreclosure is avoidable under the express terms of Bankruptcy Code § 544 and Texas Business and Commerce Code section 24.005(a)(1).

Second, Silver State argues that it is entitled to good-faith-transferee defenses under sections 24.009(a) and 24.009(d)(1) of the Texas Business and Commerce Code. Section 24.009(a) provides that "[a] transfer or obligation is not voidable under Section 24.005(a)(1) of this code [regarding actual fraudulent transfers] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." Similarly, section 24.009(d)(1) of the Texas Business and Commerce Code provides the following good-faith defense:

> Notwithstanding voidability of a transfer or an obligation under this chapter, a good faith transferee or obligee is entitled, at the transferee's or obligee's election, to the extent of the value given the debtor for the transfer or obligation, to:

---

[123] TEX. BUS. & COMM. CODE § 24.002(12) ("'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. The term does not include a transfer under a disclaimer filed under Chapter 240, Property Code.").

[124] TEX. BUS. & COMM. CODE § 24.004(b).

45

> (A) a lien, prior to the rights of a voiding creditor under this chapter, or a right to retain any interest in the asset transferred; [or] . . .
>
> (C) a reduction in the amount of the judgment.[125]

Just as Silver State was unable to assert the § 548(c) good-faith defense, Silver State may not assert these good-faith defenses because Silver State is not a good-faith transferee, having intimate and direct knowledge of 7901's intent to hinder, delay, or defraud Valley Ridge.[126]

Third, Silver State argues that under the Texas statute, a "transfer" applies to an "asset," which in turn is defined to exclude "property to the extent it is encumbered by a valid lien."[127] The Court agrees with Silver State that Valley Ridge may not avoid the transfer of the Property "to the extent" the Property was encumbered by a valid lien, but it may be avoided to the extent of the value of the Property in excess of the valid liens, or $122,856.91.[128] The Texas fraudulent-transfer statute thus provides less protection to Valley Ridge than does § 548 of the Bankruptcy Code.[129]

## D. Constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B) and Texas and Business and Commerce Code 24.006(a)

Valley Ridge also seeks to avoid the Foreclosure as a constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B) and Texas Business and Commerce Code § 24.006(a). Section 548(a)(1)(B) of the

---

[125] TEX. BUS. & COMM. CODE § 24.009(d)(1).

[126] *Cf. Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 131 (Tex. 2019) (for purposes of section 24.009(a) of the Texas Business and Commerce Code, "[a] transferee who simply accepts a transfer despite knowledge of facts leading it to suspect fraud does not take in good faith.").

[127] TEX. BUS. & COMM. CODE § 24.002(2)(A).

[128] $4.2 million gross value, less the Frost Bank lien of $3,236,995.55, less the Tarrant County lien of $99,508.99, less the City Lien of $206,252.88, less the Valley Ridge lien of $534,385.67.

[129] The Court believes this is one of the reasons why 7901 (silently cheered on by Morash and Silver State) contested the involuntary petition.

Bankruptcy Code allows a trustee to "avoid any transfer . . . of an interest of the debtor in property, or any

obligation . . . incurred by the debtor that was made or incurred on or within 2 years before the date of the filing

of the petition, if the debtor voluntarily or involuntarily—

> (B)
>> (i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>> (ii)
>>> (I)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>> (II)  was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>> (III)  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>>> (IV)  made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[130]

Texas Business and Commerce Code § 24.006(a) similarly provides as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[131]

---

[130] 11 U.S.C. § 548(a)(1)(B).

[131] TEX. BUS. & COMM. CODE § 24.006(a).

The Court has already concluded that 7901 made an involuntary transfer of the Property while it was insolvent,[132] so the constructive-fraudulent-transfer counts turn on whether 7901 received reasonably equivalent value in exchange for the transfer of the Property through the Foreclosure.

The Supreme Court in *BFP*[133] held that the price received at a regularly conducted, noncollusive mortgage foreclosure sale conclusively established "reasonably equivalent value" of mortgaged property for purposes of a constructive-fraudulent-transfer claim under § 548(a)(1)(B). Likewise, TUFTA provides that for purposes of a constructive-fraudulent-transfer claim, "a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale . . . ."[134]

To avoid these presumptions of reasonably-equivalent-value, Valley Ridge argues that the Foreclosure sale was collusive, pointing to the same evidence—the badges of fraud—it relied on in its actual-fraudulent-transfer counts.[135] The Court does not need to decide whether the badges-of-fraud evidence could support a collusion finding or, instead, whether the Court must find fraud in Garvin's conduct in actually conducting the Foreclosure sale. The Foreclosure already is avoidable as an actual fraudulent transfer based on the badges-of-fraud evidence, and Valley Ridge's constructive-fraud counts provide it no greater recovery. In other words, the badges-of-fraud evidence supports avoiding the Foreclosure as an actual fraudulent transfer; the Court does not

---

[132] 11 U.S.C. § 101(32); TEX. BUS. & COMM. CODE § 24.003(a), (d).

[133] *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994).

[134] TEX. BUS. & COMM. CODE § 24.004(b).

[135] Valley Ridge did not contest the Defendants' definition of collusion. *See* Defendants' Trial Brief ¶ 9 (citing *Clark v. Wollschlager*, 2014 Tex. App. LEXIS 5302 at * 18 (Tex. App. – Eastland 2014, no pet.) ("Collude is defined as to collaborate in wrongdoing. Collusion is defined as an agreement to defraud another or to do or obtain something forbidden by law. Collusion also is more particularly defined as an agreement between two or more persons to defraud another.")).

need to address whether that same evidence supports potentially avoiding the Foreclosure as a constructive fraudulent transfer because this second determination would not change the outcome of this proceeding.

## E.  Wrongful foreclosure

Valley Ridge asserts a wrongful-foreclosure claim, which requires a showing of "(1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price."[136]  In support of this claim, Valley Ridge argues that the Foreclosure was defective because the Second Lien Deed of Trust does not contain language adequate to secure the April 2017 Note, which by its terms "restates and replaces" the October 2015 Note.

The Court need not reach this thorny legal issue because even if Valley Ridge is correct and Silver State foreclosed as a mere unsecured creditor, Valley Ridge points to no damages beyond what it is already recovering through avoidance of the Foreclosure as a preferential and fraudulent transfer and recovery under Bankruptcy Code § 550.  Because the Foreclosure is avoided and because (as explained below) Silver State has no defenses to recovery of the Registry Funds, Valley Ridge's wrongful-foreclosure count does not alter the outcome of this proceeding.

## F.  Section 550 recovery

Through the Amended Complaint, Valley Ridge seeks recovery under Bankruptcy Code § 550(a):[137]

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for

---

[136] *Sauceda v. GMAC Mortgage Corp.*, 268 S.W.3d 135, 139 (Tex. App. – Corpus Christi, 2008) (citing *Charter Nat'l Bank-Houston v. Stevens*, 781 S.W.2d 368, 371 (Tex. App. – Houston [14th Dist.] 1989)).

[137] Although the Amended Complaint does not contain a separate count for § 550, the Amended Complaint clearly seeks recovery under § 550 for the avoided transfers.  *See, e.g.,* Amended Complaint ¶¶ 6, 30, 35, 43.

the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.[138]

Because the transfer of the Property through the Foreclosure has been avoided under §§ 547 and 548, Valley Ridge, as the successor to the 7901 Chapter 7 Trustee, may recover the Property or the value of the Property from Silver State, the initial transferee. The Property was sold free and clear under Bankruptcy Code § 363 pursuant to the Sale Order, but the Sale Order made clear that the sale did not prejudice Valley Ridge's rights in this Adversary Proceeding.[139] The proceeds in the Court registry, $577,050.37, should be considered the "property transferred" for purposes of § 550(a), so the Court orders those funds paid to Valley Ridge. Alternatively, $577,050.37 represents the net value of the Property transferred, so the Court orders that value returned to Valley Ridge from the Court registry.

To avoid recovery under § 550, Silver State asserts another good-faith defense, this time under § 550(e):

(1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of—

> (A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and
> (B) any increase in the value of such property as a result of such improvement, of the property transferred.[140]

---

[138] 11 U.S.C. § 550(a).

[139] Sale Order at 8.

[140] 11 U.S.C. § 550(e).

Silver State is not entitled to this good-faith defense because Silver State is not a good-faith transferee, having intimate and direct knowledge of 7901's intent to hinder, delay, or defraud Valley Ridge.

## G. Breach of fiduciary duty

Valley Ridge alleges that Morash, as sole member, manager, and director of 7901, owed fiduciary duties to 7901 and also to its creditors once it approached insolvency. Valley Ridge alleges that Morash breached his duties of due care, good faith, and loyalty by causing Silver State to purchase the Property at the Foreclosure rather than causing 7901 to sell the Property for the benefit of 7901 and its creditors. Morash denies that he owes duties to 7901 or its creditors, or that he breached any such duties.

Texas law provides that "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant."[141]

The Court need not decide whether Morash breached any applicable fiduciary duties to 7901 or creditors because even if he did, the Court would not award any damages beyond what Valley Ridge already will recover under 11 U.S.C. § 550. Under the facts and circumstances of this case, the Court would decline to award exemplary damages against Morash, and Valley Ridge already will recover the net value of the Property that Morash (allegedly) had a duty to obtain for the benefit of 7901 and its creditors.

---

[141] *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

**H.  Civil conspiracy/aiding and abetting concert of action**

Through this count, Valley Ridge seeks to hold Silver State and Morash jointly and severally liable on conspiracy and aiding and abetting theories for the actual fraudulent transfers and (alleged) breaches of fiduciary duties discussed above.  The Court need not address these legal theories because Valley Ridge already will recover from the Registry Funds, pursuant to 11 U.S.C. § 550, the net value of the Property that 7901 fraudulently transferred and that Morash (allegedly) had a duty to obtain for the benefit of 7901 and its creditors.

**I.  Section 542 turnover**

Valley Ridge seeks turnover of the Registry Funds pursuant to 11 U.S.C. § 542.  Silver State argues, in contrast, that turnover relief under § 542 is inappropriate when the Property transferred must be avoided and recovered instead under 11 U.S.C § 550.  It is not clear to the Court that § 542 turnover relief is appropriate under these facts even when coupled with a request for avoidance and recovery under § 550, but to the extent § 542 applies in this situation, the Court orders turnover of the funds in the Court registry to Valley Ridge.

**J.  Judicial foreclosure**

Valley Ridge sought judicial foreclosure in its Valley Ridge Amended Petition.  To the extent Valley Ridge has not already abandoned that claim, the Court denies it as moot given the sale of the Property and Valley Ridge's recovery of the Registry Funds.

**K.  Equitable subordination**

The parties' Joint Pretrial Order lists the following contested issue of law:  "Whether any lien or claim of [Silver State] and Morash should be equitably subordinated to all other liens, including Plaintiff's liens, and

52

whether such claim was properly pled, preserved, and asserted."[142]   The Court denies any such claim because neither Valley Ridge nor the 7901 Chapter 7 Trustee pled it, and in any event equitable subordination is not necessary for Valley Ridge to avoid the Foreclosure under Bankruptcy Code §§ 547 and 548 and to recover the Registry Funds under § 550.

## L.  Silver State's remaining affirmative defenses and counterclaims

Silver State asserts the following affirmative defenses and counterclaims that the Court has not already addressed.[143]

*Affirmative Defenses and Counterclaims against Valley Ridge.*   In its Amended Answer and Counterclaims Against Valley Ridge, Silver State asserts the following affirmative defenses and counterclaims, each of which the Court overrules or denies:

- Affirmative Defense:  Any lien or other right that Valley Ridge may have ever had against the Property has been extinguished as a result of the Foreclosure, and Valley Ridge has no *in personam* right or claim against Silver State.

  - The Court overrules this affirmative defense because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.

---

[142] *Joint Pretrial Order* ¶ 25, at 19, Adv. ECF No. 83.

[143] As noted above, the Parties have agreed that the quantification of any attorney's fees and costs award that the Court may issue will be determined through post-trial procedures under Federal Civil Rule 54(d).  *Joint Pretrial Order* at 21, Adv. ECF No. 83.

- Affirmative Defense:  Any action to foreclose on any alleged mechanic's lien is barred by res judicata as something that could and should have been brought in the prior action confirming Valley Ridge's arbitration award.

  o The Court overrules this affirmative defense because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.

- Affirmative Defense:  Valley Ridge should be barred from pursuing any recovery under principles of latches, unclean hands, and estoppel, because if Valley Ridge had a lien against the Property at one time, Valley Ridge intentionally delayed any action to foreclose on that lien since that lien would have been subject to multiple superior lien interests, instead waiting until a purchaser acquired title to the Property and only then seeking to enforce its alleged inferior lien after superior liens were paid or extinguished by the purchaser.

  o The Court overrules this affirmative defense because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.

- Counterclaim:  Silver State seeks declaratory relief that Valley Ridge has no claim, lien, or right against Silver State or against the Property or its proceeds.  Silver State's argument is premised on the alleged superiority of Silver State's City Lien over Valley Ridge's mechanic's lien and judicial lien against the Property.

  o The Court denies this counterclaim because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.

- Counterclaim:  Silver State seeks quiet title to the Property.  Silver State's argument is premised on the alleged superiority of Silver State's City Lien over Valley Ridge's mechanic's lien and judicial lien against the Property.

  o The Court denies this counterclaim because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.

***Affirmative Defenses and Counterclaims against 7901 Chapter 7 Trustee.***  In its Answer and Counterclaims Against 7901 Chapter 7 Trustee, which Silver State now asserts against Valley Ridge, Silver State asserts the following affirmative defenses and counterclaims, each of which the Court overrules or denies.

- Affirmative Defense:  The Trustee, standing in the shoes of Valley Ridge, should be barred by latches, unclean hands, and estoppel, from seeking to avoid the transfer, because Valley Ridge

intentionally delayed any action to foreclose on its lien because it did not want to service higher-priority debt, instead waiting until a purchaser at foreclosure purchased the property to spring its claims against such purchaser, to the purchaser's detrimental reliance and prejudice.

- o The Court denies this counterclaim because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.  Latches, unclean hands, and estoppel are not valid defenses under §§ 547, 548, and 550, and even if they were valid defenses, Silver State has not proven that they apply.  All equities in this case favor Valley Ridge, not Silver State.

- **Affirmative Defense:**  The Trustee has no secured claim because she did not file a secured claim proof of claim by the Bar Date.

- o The Court denies this counterclaim because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.  Valley Ridge, standing in the shoes of the 7901 Chapter 7 Trustee, is recovering as the rightful owner of the Registry Funds and not merely as a secured creditor with respect to the Registry Funds. In any event, the 7901 Chapter 7 Trustee Proof of Claim adequately and timely notified Silver State that the 7901 Chapter 7 Trustee sought recovery under 11 U.S.C. §§ 547, 548,

56

and 550.  The 7901 Chapter 7 Trustee Proof of Claim also notified Silver State that the Property was property of 7901's bankruptcy estate and that the sale proceeds belonged to the 7901 bankruptcy estate under § 541 and should be turned over to the 7901 estate under § 542.

- Affirmative Defense:  The Trustee has no conspiracy claim because she did not file a claim for conspiracy by the Bar Date.

  - o  The Court denies this counterclaim as moot because Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a conspiracy claimant.

- Counterclaim:  Silver State seeks disallowance of the 7901 Chapter 7 Trustee Proof of Claim. Silver State's arguments for disallowing the claim appear to be the same as those arguments against avoidance and recovery of the funds under Bankruptcy Code §§ 547, 548, and 550.

  - o  The Court denies this counterclaim because Valley Ridge's entitlement to the Registry Funds under 11 U.S.C. §§ 547, 548, and 550 is outlined above.

- Counterclaim:  Silver State seeks a surcharge against the proceeds from the sale of the Property under § 506(c) of the Bankruptcy Code.

  - o  The Court denies this counterclaim because § 506(c) does not apply under these facts. Under § 506(c), "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad

57

valorem property taxes with respect to the property."[144]

- ▪ Valley Ridge is recovering the Registry Funds in its capacity as owner of the Chapter 5 causes of action of 7901's bankruptcy estate, and not in its capacity as a secured creditor of Silver State.  It would violate the letter and the spirit of § 506(c) to allow a surcharge when Silver State—which had intimate and direct knowledge of 7901's intent to hinder, delay, and defraud Valley Ridge—has no defenses to avoidance and recovery of the funds under the Bankruptcy Code sections that actually apply:  §§ 547, 548, and 550.

## VI.    CONCLUSION

The Foreclosure is avoidable (a) in full as a preferential transfer under § 547 of the Bankruptcy Code; (b) in full as an actual fraudulent transfer under § 548(a)(1)(A) of the Bankruptcy Code; and (c) to the extent of the value of the Property in excess of the valid liens, or $122,856.91, under Texas Business and Commerce Code section 24.005(a)(1) and § 544 of the Bankruptcy Code.  Silver State has no valid defense (whether affirmative defense or otherwise) to avoidance of the Foreclosure under Bankruptcy Code §§ 547 and 548(a)(1)(A) or to Valley Ridge's recovery of the funds under Bankruptcy Code § 550.  All other relief requested by the parties, unless specifically reserved for post-trial determination, is denied.

---

[144] 11 U.S.C. § 506(c).

This document is not a final order or judgment and is not immediately appealable.  The Court will enter a separate final judgment consistent with these Findings of Fact and Conclusions of Law after quantification of any attorney's fees and costs award that the Court may issue through post-trial procedures under Federal Civil Rule 54(d).

### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###